Mary Lou NUSSINOW, Executrix of the
Estate of Aida Siegel, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 400–89 L.

United States Claims Court.

July 23, 1991.

Bernard L. Nussinow, Selden, N.Y., for plaintiff.

Anthony P. Hoang, Washington, D.C., for defendant. Ellen Athas Ferlo, Dept. of Justice, and Charles R. Braun, U.S. Postal Service, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge.

This case is before the court on the parties' cross motions for summary judgment. For the reasons stated below, the court dismisses the complaint for lack of jurisdiction.

## FACTS

Since 1953, the United States, acting through the United States Postal Service (USPS), leased a garage located at 6415 South Main Street, Los Angeles, California (South Garage). Its present possession is based upon a ten-year lease signed in 1971 with the Maler Investment Company. The lease provided for two five-year renewal options, the second of which defendant exercised on September 1, 1986, resulting in a final expiration date of August 31, 1991. Since 1971, the garage has changed ownership several times, each change resulting in assignment of the lease to the new owner. The most recent owner, Aida Siegel, died just prior to commencement of this action, leaving her estate (including the lease) to plaintiff, Mary Lou Nussinow.

Until it left the property in February of 1989, USPS used the garage as a Vehicle Maintenance Facility (VMF). Under the terms and conditions of the lease, the lessor had the responsibility of equipping the garage with, among other things, gasoline, waste oil, and engine oil storage systems. The lessor fulfilled its obligation by providing a 10,000–gallon underground storage tank for unleaded gasoline, and two 550–gallon underground tanks for waste oil, and engine oil, respectively.

In 1986, the gasoline tank failed precision testing. As a result, the City of Los Angeles Fire Department instructed USPS to discontinue using underground storage tanks at all of its VMFs pending further investigation. USPS complied, initiated its own investigation of the South Garage tank problem, and eventually authorized the expenditure of $20,000 for repairs. However, when USPS learned from a subsequent report that repairs to the tank would cost $147,123, it decided not to repair but, instead, to invoke Paragraph 18 of the lease which required the government to repair and maintain equipment provided by the lessor at the South Garage except in cases where it decided that it no longer could maintain the equipment economically. In such cases, the government could, without cost to it, require the lessor to remove defective equipment from the premises.

Through a series of correspondences with plaintiff, USPS directed plaintiff to remove the tanks pursuant to Paragraph 18; however, those correspondences did not result in any action by plaintiff. Nothing further was done with the tanks until June 9, 1988, when USPS privately contracted for a precision, volumetric, quantitative, leak test of all three underground storage tanks. The test certified that the leakage rates for the tanks were within standards set by federal, state, and local agencies. Satisfied with the test, USPS discontinued its effort to have plaintiff remove the

tanks, and again began fueling vehicles from the South Garage.

On October 6, 1988, the VMF learned it would move to a new location and no longer occupy the South Garage. Pursuant to this information, USPS began negotiations for early termination of the lease which culminated in its drafting an agreement to terminate the lease on February 28, 1989. According to the document, USPS was to pay plaintiff $36,250 in exchange for plaintiff's agreement to an early termination date. USPS sent the unexecuted document to plaintiff. Plaintiff signed and returned the document to defendant on January 24, 1989. Defendant never executed the agreement. However, on February 28, 1989, on or about the time it vacated the South Garage, USPS sent plaintiff a copy of the unsigned agreement, an unsigned copy of the Notice of Termination of Lease, and a memo which informed plaintiff of its rights to reimbursement of general real estate taxes. On that day, plaintiff conducted a final walk through of the premises. Plaintiff was dissatisfied with the results of the walk-through and, on at least two occasions, notified USPS of its dissatisfaction with the physical conditions of the facility.

According to defendant, the termination negotiations with plaintiff soured as a result of USPS' renewed concern about the condition of the underground storage tanks. Specifically, USPS feared liability resulting from terminating the lease with potentially defective storage tanks still in the ground. Throughout March, 1989, even though it was no longer occupied the South Garage, USPS maintained its efforts to have plaintiff remove the underground tanks, seeking to make removal part of the termination agreement. Plaintiff refused, contending that it already had a binding agreement with USPS. The parties were unable to reach an agreement on tank removal and, on July 20, 1990, USPS contracted with a third party to remove the tanks at USPS' expense. Upon undertaking the tank removal at the South Garage, the contractor discovered more underground tanks than originally anticipated. By the time the tank removal project was completed on August 21, 1991, the contractor had removed a total of six underground tanks from the premises, at a total cost of $85,688.20.

USPS has not used the facility since it relocated, but continues to pay rent to plaintiff. There is some dispute over whether USPS has continued to fulfill its real estate tax obligation.

On July 19, 1989, plaintiff filed a complaint in this court which she amended on December 7, 1989. The amended complaint alleged six causes of action, which were as follows:

1. $250,000 for damages incident to defendant's breach of its termination agreement with plaintiff. Plaintiff contended that defendant's failure to forfeit the premises caused plaintiff to lose a replacement lease.

2. $36,250 as consideration owed by the defendant under the alleged termination agreement.

3. $50,000 for damages incurred as a result of USPS allowing the garage to fall into a state of disrepair.

4. $50,000 for damages resulting from defendant's failure to repair and maintain non-petroleum related equipment at the South Garage.

5. $250,000 for damages resulting from defendant's failure to maintain and service the gasoline storage system provided at the South Garage.

6. $100,000 for damages incurred pursuant to defendant's removal of the underground tanks.

Defendant denied plaintiff's allegations and counterclaimed for $85,688.20, the costs of removing the underground storage tanks. However, on May 14, 1991, defendant moved to dismiss its counterclaim, which this court allowed on May 21, 1991.

## DISCUSSION

At the outset, the court notes that it appears plaintiff has failed to provide support for the damages claimed in her third through sixth causes of action, and plaintiff's first and second causes of action rest on the existence of an unexecuted amend-

ment to the lease. Plaintiff suggested to the court that execution was not necessary, because it obviously was the intent of the parties to have a binding agreement. Such a reading of the events that transpired tortures the facts, and stretches the law beyond its traditional application. The court need not reach the merits of any of plaintiff's claims, as it lacks jurisdiction to adjudicate the case.

■ In its motion for summary judgement, defendant raised the issue of this court's jurisdiction over plaintiff's first three causes of action. Although defendant did not challenge jurisdiction with regard to plaintiff's fourth through sixth causes of action, this court must determine, for itself, whether it has jurisdiction over all of plaintiff's claims, even if it must do so *sua sponte*. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986).

■ This court's jurisdiction is defined by the Tucker Act, 28 U.S.C. § 1491 (1988). The Tucker Act alone does not create a substantive right to recover money, but instead waives sovereign immunity under specific conditions. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). In order for this court to exercise jurisdiction over plaintiff's claims, the claims must be predicated on a constitutional provision, statute, executive department regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (1988). In this case, plaintiff has asserted jurisdiction under the Contract Disputes Act (CDA) which applies to "any express or implied contract ... entered into by an executive agency for ... the disposal of property," 41 U.S.C. § 602(a)(4), including lease agreements, *see Forman v. United States*, 767 F.2d 875, 878 (Fed.Cir.1985). The term "executive agency" includes USPS. 41 U.S.C. § 601(2).

■ While the bare existence of a contract with defendant meets the threshold jurisdictional requirements under the Tucker Act, the CDA imposes additional requirements plaintiff must meet before this court can assume jurisdiction. Under the CDA, before a plaintiff can invoke this court's jurisdiction, all claims arising out of plaintiff's contract with the government must "be in writing and [must have been] submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). In addition, for claims of more than $50,000 the contractor must:

> certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1). In this case, plaintiff has neither submitted her claims to the contracting officer for a final decision, nor certified any of her claims.

■ Certification of claims to the contracting officer is a jurisdictional prerequisite to bringing a claim before this court and the failure to certify deprives the contracting officer, this court, and the United States Court of Appeals for the Federal Circuit of jurisdiction to proceed on the claims. *Tecom, Inc. v. United States*, 732 F.2d 935 (Fed.Cir.1984). Submittal of the claim to the contracting officer is important but certification is all important. In the absence of jurisdiction, the court is generally without authority to take any action other than to dismiss the complaint with prejudice but need not take such a drastic step when the jurisdictional deficit is easily remedied.[1]

■ Plaintiff contended that two facsimiles sent to defendant constituted sufficient presentation of the claim to satisfy

---

1. The certification requirement is not an onerous one. It merely calls for a declaration of honesty and good faith on the part of the contractor in the submission of claims to the contracting officer. It has been documented that certification serves a purpose. *See Fidelity Constr. Co.*, 700 F.2d 1379, 1383 (Fed.Cir.), *cert.* denied, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983). If a contractor or his attorney has any qualms about certification of a claim, it should err on the side of certification and not against certification. By doing so, contractors will obviate jurisdictional skirmishes such as the one now before the court.

both CDA requirements. The first facsimile sent on March 7, 1989, and signed by the plaintiff, stated:

> Pursuant to the surrender of the lease, your continued failure to vacate (Los Angeles, CA. South Garage, Main St.) is charged at the rate of $1,000 per day in addition to all other remedies available against you.

The second facsimile, dated March 9, 1989, also signed by the plaintiff, stated:

> Your continuing obligation of maintenance and security will continue until you surrender the premises consistent with termination of the lease as of 2/28/89.

Plaintiff's reliance on these two documents as proof she satisfied the CDA requirements implied plaintiff believed that the court may consider all of her claims in the aggregate. Plaintiff is incorrect. For CDA presentation and certification purposes, the court must aggregate claims that are based on a common or related set of operative facts, but separate claims that do not share this relationship. *See generally, Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed.Cir.1990). This criterion prevents plaintiffs from circumventing the requirements of the CDA by custom tailoring their claims. *See Id.* at 907. For example, a plaintiff is not permitted to split a $60,000 claim into two $30,000 claims, to evade the certification requirement, if the two $30,000 claims are based on a common or related set of operative facts. *See Id.* at 907. Nor may a plaintiff aggregate unrelated claims in order to meet the presentation requirement where it has presented one claim, but failed to present an unrelated claim. *See Id.* at 907.[2]

In determining whether two claims are based on a common or related set of operative facts, the court must look to the evidence that supports each of the claims. "If the court will have to review the same or related evidence to make its decision, then only one claim exists." *Id.* at 907. Applying this test, it becomes apparent that plaintiff, in this case, essentially made two sets of claims:

> (1) one set (in four counts) to recover for USPS' failure to repair and maintain the South Garage and its related equipment, *i.e.*, claims for property damages; and

> (2) one set (in two counts) to recover for damages incident to USPS' breach of the alleged termination agreement, *i.e.*, claims for "breach" of contract.

In order to decide the merits of plaintiff's property damage claims, the court would have to review evidence proving damage to the leased property and equipment, as well as those sections of the original 1971 lease dealing with USPS' duty to repair and maintain the premises. However, in order to rule on plaintiff's claims for breach, the court would require only evidence supporting the existence of the termination agreement, and the damage caused by its breach. Such a review would not require an examination of the original lease, nor of evidence related to damage of the leased premises and equipment. The CDA requires that plaintiff submit both of these separate sets of claims to the contracting officer individually. *See generally Id.* at 907. Submission of one set cannot satisfy the submission requirement as to the other set. *See generally Id.* at 907.[3]

I. Submission of the Claim to a Contracting Officer

▮ Under the CDA, a plaintiff need not submit a claim to a contracting officer in any particular form, nor must the claim use any special language. *See Contract Cleaning and Maint. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). "All that is required is that a plaintiff submit in writing to the contracting officer a clear and

---

**2.** While the Federal Circuit in *Placeway* discussed only the issue of claim separation and aggregation as it applies to the certification requirement, this court interprets the decision to apply to all jurisdictional requirements of the CDA, including presenting the claim to the contracting officer.

**3.** The court notes that even if it had jurisdiction, it could not rule on the cross-motion for summary judgement, at least as to the damage claims, because of the existence of genuine issues of material fact.

unequivocal statement that gives the contracting officer adequate notice of the basis and the amount of the claim." *Id.* at 592. In addition, the claim must be for a sum certain. *See Tecom, Inc. v. United States,* 732 F.2d 935, 936–937 (Fed.Cir. 1984); *see also Cubic Corp. v. United States,* 20 Cl.Ct. 610, 617 (1990); *Metric Constr. Co. v. United States,* 14 Cl.Ct. 177, 179 (1988); *Z.A.N. Co. v. United States,* 6 Cl.Ct. 298, 304 (1984). The rationale for this second requirement is obvious; a contracting officer cannot make a final decision on an amount that is not specific. *See Metric Constr.,* 14 Cl.Ct. at 179.

In the present case, plaintiff did not, in any sense, submit the property damage claims to the contracting officer. Plaintiff's first facsimile nowhere mentioned liability for property damages; it mentioned only defendant's potential liability arising out of USPS' failure to vacate. Plaintiff's second facsimile made no claim at all; it merely reminded defendant of its continuing obligations. Even were the court to consider the second facsimile a claim submission, that facsimile did not give the contracting officer adequate, or any, notice of the amount claimed as required by the CDA. *See Contract Cleaning,* 811 F.2d at 592. In addition, the court could not assume jurisdiction over plaintiff's property damage claims were it to find it has jurisdiction over plaintiff's claims for breach, because, as stated above, the court is required to treat the property damage claims as separate from the breach claims.

Plaintiff's argument that she presented to a contracting officer a claim for breach of the termination agreement has some colorable merit, but ultimately fails. Under an exceedingly broad interpretation of plaintiff's first facsimile, the court might possibly find that plaintiff provided USPS some notice of the basis of a unilaterally-imposed claim for liquidated damages or penalty. However, in no way could it find that plaintiff adequately notified USPS of any claim under the contract or of the amount of any claim. Plaintiff's claims for breach totaled $286,250. The first facsimile merely stated that plaintiff would charge USPS $1,000 per day for its failure to vacate, but nowhere indicated the number of days for which plaintiff would claim, nor did it indicate potential liability for the alleged loss of a replacement lease. Consequently, the contracting officer was not put on notice that it was being asked to decide a claim amounting to such a large figure.

The Federal Circuit occasionally has allowed a plaintiff to seek in this court an amount larger than the amount originally requested, but, in all such cases, plaintiff was required to demonstrate that the final amount was a logical extension of the original amount sought. *See Contract Cleaning,* 811 F.2d at 586; *Tecom* 732 F.2d at 937. In this case, plaintiff did not show any connection between the $1,000 per day "claimed" in the facsimile, and the total amount plaintiff requested in this court; nor could plaintiff demonstrate that $286,250 was a logical extension of that claim. Even more fundamentally, plaintiff never made an original claim for a fixed sum from which plaintiff could have shown a logical extension. A fixed sum either is a specified dollar amount, or specification of an amount that can be calculated using simple arithmetic. *See Cubic Corp.,* 20 Cl.Ct. at 617; *Metric Constr.,* 14 Cl.Ct. at 179. If a plaintiff submits a claim for which the amount must be calculated, it must include enough detail to allow the contracting officer to consistently calculate the correct amount. *See Metric Constr.* 14 Cl.Ct. at 179. In this case, plaintiff requested $1,000 per day but did not specify the number of days for which this rate applied. Consequently, it would be impossible for a contracting officer to calculate a fixed amount. Absent a fixed sum, plaintiff simply has failed to meet the presentation requirement.

## II. Certification

In addition to failing to present her claim to the contracting officer, plaintiff also has failed to certify any of her claims. In evaluating plaintiff's claims for the purpose of certification, the court is required to aggregate claims that are based on a common or related set of operative facts. *See Placeway Constr.,* 920 F.2d at 907.

Plaintiff may not separate claims so as to avoid the certification requirement. *Id.* at 907. Plaintiff's claims fall into one of two categories: those for property damages, and those for breach of the alleged termination agreement. The total amount plaintiff claimed in each of these categories far exceeds the $50,000 minimum for certification.

Plaintiff insisted that her claims did not need to be certified, because when made, they were for less than $50,000. Plaintiff relied on a Federal Circuit decision that held the CDA does not require certification for a claim exceeding $50,000, if the original claim was for less than $50,000, and the final claim is (1) of the same fundamental character as the original claim, and (2) a logical extension of the original claim reasonably based on further information. *See Contract Cleaning* 811 F.2d at 591–92; *Mendenhall v. U.S.*, 20 Cl.Ct. 78, 85 (1990). Although somewhat unclear, plaintiff seemed to suggest that her original claim was for $1,000, *i.e.*, for one day, and that her final claim satisfied the above criteria. However, the court must reject plaintiff's reasoning as unsound for two reasons. First, $836,250, in no way is a logical extension of $1,000. Second, were the court to accept plaintiff's position, it would all but eliminate the certification requirement by allowing future plaintiff's to disaggregate their claims into daily amounts, thereby evading the certification requirement. This the court will not do.

## CONCLUSION

The CDA specifically delineates two relatively simple jurisdictional requirements a plaintiff must meet before coming to this court. Plaintiff failed to meet either requirement. The court cannot permit plaintiff to access this court improperly, and must deny jurisdiction. The court, therefore, directs the Clerk to dismiss the complaint without prejudice. No costs.

IT IS SO ORDERED.