Hussam T. HAMZA, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–591C.

United States Court of Federal Claims.

May 13, 1994.

---

Joseph F. Runey, Charleston, SC, for plaintiff.

Steven J. Gillingham, Washington, DC, with whom was Warren G. Swartz, and Matt Thomason, of counsel, and Asst. Atty. Gen. Frank W. Hunger, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). For the reasons set forth below, defendant's motion is granted.

### FACTS

Plaintiff, Hussam T. Hamza, a citizen of Saudi Arabia, owns real property and buildings located in the Kingdom of Saudi Arabia, collectively known as the Hamza Compound. On October 8, 1990, plaintiff leased the Hamza Compound to the United States Government for an annual rental rate of $1,750,000. The Dhahran Area Office (DAO) of the United States Army Corps of Engineers executed the lease in Saudi Arabia in support of Operation Desert Storm. The parties executed the lease for a one year term, from September 30, 1990 to September 29, 1991; the lease contained an option for defendant to renew for an additional year "provided that notice be given in writing to the LESSOR by the LESSEE not less than sixty (60) days before this lease would otherwise expire." In addition, paragraph 6 of the lease required that plaintiff notify defendant at least thirty days prior to expiration of the lease if defendant was responsible for restoration of the premises. Restoration involved returning the premises in "as good a condition as that existing at the time of entering" upon the premises, less reasonable and ordinary wear and tear. Under this provision, defendant had the option of either making a monetary settlement with plaintiff or performing the restoration.

Pursuant to paragraph 7 of the lease, which gave defendant the right to transfer and assign the lease, defendant notified plaintiff on December 12, 1990 of its intent to exercise this right, and on March 20, 1991, executed an Assignment and Transfer Agreement with the Kingdom of Saudi Arabia. Under the Agreement, the Kingdom of Saudi Arabia agreed to perform the duties in the lease, including payment of all rents due. A copy of the Agreement was mailed to plaintiff on March 25, 1991. Nevertheless, on June 19, 1991, following his final inspection of the property, plaintiff notified defendant in writing of defendant's obligation to repair all damages to the property, as required by paragraph 6 of the lease.

By August 1991, defendant had not exercised the option to renew. As a result, plaintiff informed defendant, in a letter dated August 3, 1991, that according to paragraph 3 of the lease, its failure to notify him constituted automatic renewal of the lease for a second year. Plaintiff then requested the first rental payment for the additional year, one-half of the annual rental rate.

In a letter dated August 4, 1991, DAO disagreed with plaintiff's interpretation and construed paragraph 3 to state that defendant's silence did not constitute automatic renewal of the lease, but rather, renewal required that defendant notify plaintiff of its desire to exercise the option to renew within sixty days prior to expiration of the lease. DAO argued that defendant's failure to notify plaintiff indicated that it did not intend to renew the lease. DAO also requested that plaintiff, pursuant to paragraph 6 of the lease, submit an itemized list of damages to the premises and the estimated cost to restore the premises to its condition at the time of the execution of the lease. Plaintiff provided the list of damages and estimates for restoration on August 5, 1991, without mentioning additional rent.

In lieu of performance of its restoration obligation, defendant entered into a supplemental agreement with plaintiff on December 10, 1991, in which defendant exercised its right, under paragraph 6 of the lease, to make a monetary settlement with plaintiff for damages totalling $13,333.34. The provisions

of the supplemental agreement at issue here stated that defendant vacated the premises on June 19, 1991, and that the lease was terminated on the date of the execution of the supplemental agreement, December 10, 1991, thereby releasing defendant from further liability.

On March 11, 1992, plaintiff informed defendant, in a letter to Warren Swartz, an attorney with the United States Army Corps of Engineers, Savannah District, whom he believed to be responsible for claims arising out of Desert Storm, that he sought payment from defendant for the period October 1, 1991 through December 10, 1991, the final seventy days of the lease. Plaintiff requested that Swartz contact him to discuss the claim, or forward the letter to the person responsible for processing the claim.

In a meeting held on March 14, 1992 between plaintiff, Lt. Colonel Saud Al–Dabaan, Saudi Arabian Ministry of Defense and Aviation (MODA), and Lt. Colonel Nassir Al–Doussary, a Saudi Arabian Support Unit Officer, Lt. Colonel Saud requested that responsibility for resolving the issue be placed with MODA because the lease was assigned to Saudi Arabia. Plaintiff insisted that his claim was not against Saudi Arabia, but rather, the United States Government.

E.A. Sousa of the United States Corps of Engineers, Dhahran Area Office, Saudi Arabia, sent a memorandum of the March 14, 1992 meeting to Swartz, notifying him that MODA would handle the claim, but would not pay plaintiff because the Saudi Arabian Government previously had reimbursed defendant for plaintiff's claim. The specific reimbursement was the direct result of an agreement between the United States and Saudi Arabia Governments which provided for remuneration by the Saudi Arabian Government of all expenses incurred by the United States as a result of Operation Desert Storm. On March 16, 1992, Sousa executed a requisition voucher internally setting aside funds in the event that either the United States or Saudi Arabia was held liable for plaintiff's claim. Sousa then sent plaintiff's case file to Lt. Colonel Saud Al–Dabaan. On December 14, 1992, a meeting was held between plaintiff, Captain White, and Lt. Colo-

nel Saud Al–Dabaan. A settlement was reached whereby the United States Corps of Engineers agreed to pay plaintiff seventy days' rent.

Swartz responded to plaintiff's March 11 letter on March 23, 1992, confirming that his office was responsible for entering into leases on behalf of defendant for Operation Desert Storm, and contended that defendant vacated the premises on June 19, 1991, after final inspection of the property. According to defendant, the December 10, 1991 supplemental agreement served to identify the damages defendant owed to plaintiff, which were subsequently paid, and unconditionally released defendant and the Kingdom of Saudi Arabia from any other claims arising out of the lease. Therefore, because plaintiff waived his right to make any further claims under the lease against defendant, no rent was due from defendant. Moreover, as a result of the Assignment and Transfer Agreement, the Saudi Arabian Government was the party responsible for the lease. Defendant stated that it would forward the claim to Lt. Colonel Saud Al–Dabaan, the officer responsible for the disposition of any claims against Saudi Arabia.

By letter to Swartz with a copy to Lt. Colonel Saud Al–Dabaan dated April 7, 1992, plaintiff maintained that possession of the property was not returned to him and the lease was not terminated until December 10, 1991, seventy days beyond the term of the original lease. Plaintiff further contended that because a contractual agreement did not exist between plaintiff and the Saudi Arabian Government, the Saudi Arabian Government was not responsible for the rent due. Plaintiff stated that he hoped to settle without litigation, but if defendant did not accept responsibility, and if negotiations were not commenced by defendant or the Saudi Arabian Government, plaintiff intended to file a lawsuit by the end of April 1992.

In a letter to plaintiff dated April 22, 1992, Swartz again asserted that because the lease was assigned to Saudi Arabia, the appropriate official for processing the claim was Lt. Colonel Saud Al–Dabaan. Swartz contended that negotiations to settle any claims began November 1991 and ended December 1991.

Because plaintiff never presented a claim for additional rent prior to execution of the supplemental agreement on December 10, 1991, no payment is due.

On April 24, 1992, James Ellis, Chief of Real Estate Division, United States Corps of Engineers, Savannah District, wrote Lt. Colonel Saud Al–Dabaan, advised him of plaintiff's claim, and forwarded plaintiff's March 11, 1992 letter and Swartz's March 23 response to him. As a result, Lt. Colonel Saud Al–Dabaan, Lt. Colonel Nassir Al–Doussary, Captain White of the American Forces in Saudi Arabia, and plaintiff met to discuss the case. In a second meeting, White informed plaintiff that he lacked the authority to process the claim. However, because White believed plaintiff was entitled to the seventy days' rent, he would attempt to persuade the United States Corps of Engineers, Savannah District, to settle.

Plaintiff informed defendant, in a letter to Swartz dated May 20, 1992, that he had contacted various officials within the Saudi Arabian Government who insisted that his claim was the responsibility of defendant, not the Saudi Arabian Government. As a result of the Saudi Arabian Government's position, plaintiff stated his intention to end negotiations and file a lawsuit requesting rent for an entire year, not just the seventy day period, if a favorable response was not received from defendant. Swartz responded on June 3, 1992, again maintaining that the supplemental agreement released the defendant from any claims. Two months later, plaintiff filed an action against defendant in the United States District Court of South Carolina seeking one year's rent, prejudgment interest, attorney fees and costs.

By order dated June 25, 1993, the United States District Court of South Carolina transferred plaintiff's case to this court, pursuant to 28 U.S.C. § 1631, to cure a lack of jurisdiction. Four months later, to the date, plaintiff filed a complaint in this court seeking one years' rent. Defendant filed a motion to dismiss, on January 3, 1994, alleging that plaintiff never submitted a certified "claim" to the contracting officer, a prerequisite to this court's jurisdiction under the Contract Disputes Act of 1978, 41 U.S.C.

§§ 601–613 (1988 & Supp. IV 1992). In his response to defendant's motion, plaintiff indicated that he only sought enforcement of the settlement agreement which would entitle him to rent for seventy days. Averring that both Saudi Arabian and United States law applied, plaintiff argued that: (1) he submitted a certified "claim" by submission of a claim to MODA and Captain White, and issuance of a voucher by the United States Army certified his claim; (2) the December 10, 1991 settlement agreement was for property damage only; (3) his claim is not the responsibility of the Saudi Arabian Government; and (4) defendant should be estopped from repudiating its settlement agreement.

### DISCUSSION

 When subject matter jurisdiction is questioned, the non-moving party bears the burden of establishing the court's jurisdiction. *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). While the court must accept as true any undisputed allegations of fact made by the non-moving party, disputed questions of fact relevant to jurisdiction may be decided by the court. *Id.* at 747; *Hedman v. United States*, 15 Cl.Ct. 304, 306 (1988).

I. The Jurisdictional Prerequisites of the Contract Disputes Act

 This court's jurisdiction is defined by the Tucker Act. 28 U.S.C. § 1491 (Supp. IV 1992). The Tucker Act alone does not create a substantive right to recover money, but instead waives sovereign immunity under specific conditions. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980). In order for this court to exercise jurisdiction over plaintiff's claims, the claims must be predicated on a constitutional provision, statute, executive department regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (Supp. IV 1992); *Nussinow v. United States*, 23 Cl.Ct. 556, 559 (1991). In the instant case, plaintiff, in its response brief to this motion, asserted jurisdiction under the Contracts Disputes Act (CDA), which applies to "any express or implied contract ... entered into by an executive agency for ... the procurement of property, other than real property in being." 41 U.S.C. § 602(a)(1). The term "executive agency" includes military departments. 41 U.S.C. § 601(2). "Real property in being," which is excluded from the scope of the statute, refers to procurement of existing interests. *Forman v. United States*, 767 F.2d 875, 878 (Fed.Cir.1985). Because execution of a lease establishes a new interest, the lease falls within the purview of the statute. *Id.* at 879.

Under the CDA, jurisdiction over a claim vests in this court only after a contractor has submitted a valid claim to the contracting officer and the contracting officer has denied the claim or failed to deny it within sixty days. 41 U.S.C. § 605, 609; *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338–39 (Fed.Cir.1983); *Paragon Energy Corp. v. United States*, 645 F.2d 966, 227 Ct.Cl. 176, 184 (1981). Because the CDA does not expressly define a claim, this court may evaluate the sufficiency of a claim against the definition established in the Federal Acquisition Regulations (FAR), which implement the CDA. *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 877 (Fed.Cir.1991). The FAR define a claim as, "a written demand or written assertion ... seeking, as a matter of right, the payment of money in a sum certain, ... or other relief arising under or relating to the contract. A request for payment that is not in dispute when submitted is not a claim." 48 C.F.R. § 33.201 (1991).

 The CDA also requires that claims of more than $50,000 be certified. 41 U.S.C. § 605(c)(1) (1988). Certification requires that "[a] contractor claim exceeding $50,000 shall be accompanied by a certification that: (1) the claim is made in good faith; (2) supporting data are accurate and complete to the best of the contractor's knowledge and belief; and (3) the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable." 48 C.F.R. § 33.201; *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1579 (Fed.Cir.1992). The purpose of the certification requirement is to "discourage the submission of unwarranted contractor claims" and to be able to hold a contractor personally liable for fraudulent claims.

*Transamerica,* 973 F.2d at 1579–80; *Paul E. Lehman, Inc. v. United States,* 673 F.2d 352, 230 Ct.Cl. 11 (1982).

## II. Defendant's Motion

In support of its motion, defendant argued that plaintiff did not comply with the CDA because plaintiff's purported claim was not submitted to the contracting officer; failed to demand a sum certain; failed to request a final decision; gave no indication that negotiations were being discontinued; and was not certified. In response, plaintiff averred that he submitted a valid claim to MODA and the United States Army Contracting Officer in Saudi Arabia, and a requisition voucher issued by the United States Army certified his claim.

In reviewing plaintiff's letters, several factors merit consideration in determining whether or not the letters constitute a certified claim. The court must ascertain whether the letters: 1) were submitted to the contracting officer; 2) asserted specific rights; 3) requested specific relief of a sum certain; 4) requested a final decision; 5) were sent in the context of a dispute with the intent to abandon negotiations; and 6) contained the requisite certification.

### A. Submission of a "claim"

■ Because defendant considered plaintiff's letters separately, defendant incorrectly concluded that none of the letters constituted a claim. However, several documents, as a whole, might constitute a valid claim. *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987). Accordingly, this court must consider whether plaintiff's letters collectively qualify as a certified claim.

#### 1. Submission to the contracting officer

■ Section 605(a) of Title 41 U.S.C. states: "All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." While the CDA requires submission of a contractor's claim to the contracting officer, it does not govern how submission of the claim is to be accomplished. *Dawco,* 930 F.2d at 880. "Submit" is defined as surrendering or yielding to the will or authority of another. *American Pac. Roofing Co. v. United States,* 21 Cl.Ct. 265, 267 (1990); Webster's New Collegiate Dictionary 1160 (1975). Although the contractor may submit a claim without sending it directly to the contracting officer, the contractor must distinctly surrender the claim to the contracting officer for a final decision. *American Pac. Roofing,* 21 Cl.Ct. at 267.

■ The fact that plaintiff addressed his claim to Swartz is irrelevant so long as the plaintiff committed the claim to the contracting officer and yielded to his authority to make a final decision. Plaintiff attempted to send his claim to the correct person by following the instructions of the Corps of Engineers who informed him that Swartz was handling claims arising out of Desert Storm. In the event that this information was incorrect, plaintiff ensured submission to the contracting officer by requesting that Swartz forward his claim to the appropriate person for processing. Such action is precisely what the broad language of the CDA authorizes. "Congress crafted the wording of § 605 to permit appropriate Government officers to receive written claims and forward them to the contracting officer." *Id.* at 268.

The legislative history of the statutory language "submitted to the contracting officer" explains Congress's intent; "If ... the contracting officer is not the primary decision[-]maker on the contract matter, the Government must tell the contractor this, and tell the contractor who is making the decision. From this course of action the contractor will know with whom he is dealing." *Id.;* S.Rep. No. 1118, 95th Cong., 2d Sess. 1, at 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5256. Through Swartz's March 23 letter, defendant identified the primary decisionmaker for plaintiff's claim. Swartz's letter informed plaintiff that Swartz's office was responsible for entering into leases, but that Lt. Col. Saud Al–Dabaan was the officer responsible for the disposition of any claims. Following this notification, plaintiff ensured submittal of his claim to the proper authority by mailing his claim to both Swartz and Lt. Col. Saud Al–Dabaan, and requesting a deci-

sion from both officers. Although defendant may not have forwarded plaintiff's claim to the appropriate person, plaintiff nevertheless satisfied the submission requirement of the CDA by requesting that his claim be forwarded and adhering to defendant's instructions, thereby surrendering his claim to the authority of another. *See American Pac. Roofing,* 21 Cl.Ct. at 267.

### 2. Assertion of rights

 A claim must demand or assert as a legal right the payment of stated amounts of money. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1395 (Fed.Cir.1987). Although no particular form is required, the contractor must submit "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning,* 811 F.2d at 592. Plaintiff asserted his right to payment and stated the basis of his claim in his March 11 and April 7 letters by declaring entitlement to past due lease payments because "possession of the leased property was not returned to him until December 10, 1991." Defendant demonstrated his knowledge of the basis and amount of plaintiff's claim in a memo dated March 14, 1992 and in a letter dated April 24, 1992, which stated, respectively: "rent is claimed for the period 1 October 1991 through 10 December 1992. Mr. Hamza claims that the compound was never returned to him [and that] he only gained access to the compound in October 1991;" "Mr. Hamza is claiming that the leased property was not returned to him, and that he is owed additional rent payments....'' Defendant cannot deny plaintiff's assertion of rights that it previously acknowledged.

### 3. Request for specific relief of sum certain

 The contracting officer must receive a "clear and unequivocal notice of the amount of the claim." *Sun Eagle Corp. v. United States,* 23 Cl.Ct. 465, 472 (1991). This requirement is satisfied when the amount in dispute can be determined by a simple mathematical calculation. *Metric Constr. Co. v. United States,* 14 Cl.Ct. 177,

179 (1988). In plaintiff's letters dated March 11 and April 7, he requested rent for the "final seventy (70) days of his lease" and "until December 10, 1991." As evidenced by Sousa's March 16 memo and defendant's brief, defendant was able to calculate the amount requested and conclude that the amount of the claim was $335,616.[1] The only issue in dispute was whether plaintiff was entitled to his claim; the government certainly knew the amount.

### 4. Request for final decision

 The CDA's broad language requiring submission of a claim to the contracting officer "for decision" only requires "an expression of interest" in a final decision by the contracting officer. *Transamerica,* 973 F.2d at 1577. This expression of interest may be made implicitly. *Id.* "As long as what the contractor desires by its submissions is a final decision," the requirement of submittal of a written claim "for decision" is satisfied. *Id.* at 1576. In fact, it is not inconsistent to implicitly request a final decision and at the same time explicitly request a meeting to discuss the issue. *Id.* at 1577. Plaintiff implicitly sought a final decision by the contracting officer in a letter dated April 7 by stating, "if it is the United States Government's position that it has no responsibility, a lawsuit would be filed." In addition, plaintiff pursued continued negotiations in an effort to avoid litigation by stating, "unless negotiations are commenced, ... I plan to file litigation." Plaintiff's action complies with the purpose of the CDA which is to induce resolution of more contract disputes by negotiation prior to litigation. *Id.* at 1579. Accordingly, plaintiff's implicit request for a final decision and request for further negotiation are not inconsistent and do not preclude plaintiff's letters from qualifying as a claim.

### 5. Dispute and abandonment of negotiations

 A request for payment that is not in dispute when submitted is not a claim. 48 C.F.R. § 33.201; *Dawco,* 930 F.2d at 878. Disagreement, combined with intent to dis-

---

1. 70 days/365 days × $1.75 million (one year's rent) = $335,616.

continue negotiations, is necessary to transform a request into a dispute, hence a claim. *Id.* Plaintiff's second request for payment was submitted on April 7, 1992, after defendant denied liability for plaintiff's claim and effectively disputed plaintiff's right to additional rent.

■ Although it is unclear whether negotiations had ended completely, a willingness by plaintiff to continue negotiations is not necessarily inconsistent with the existence of a claim. *Contract Cleaning,* 811 F.2d at 592. "The fact that in those letters the appellant frequently expressed the hope that the dispute could be settled and suggested meeting to accomplish that result does not mean that those letters did not constitute claims." *Transamerica,* 973 F.2d at 1579; *Contract Cleaning,* 811 F.2d at 592. If letters containing language such as, "I suggest we resolve this matter with negotiation" constitute a claim, *Contract Cleaning,* 811 F.2d at 589, then certainly plaintiff's expressed hope of settlement and commencement of negotiations on April 7, 1992 does not prevent the qualification of plaintiff's letters as a claim under the CDA. Furthermore, plaintiff's letter dated May 20 clearly demonstrated that he intended to abandon negotiations: "If I do not receive a favorable response from you, I plan to forego any further negotiations...." The purpose of the CDA, to induce resolution of contract disputes by negotiation, demonstrates that there is no inconsistency between "the existence of a valid CDA claim and an expressed desire to continue to work mutually toward a claim's resolution." *Transamerica,* 973 F.2d at 1579. Accordingly, after considering all of plaintiff's letters, this court finds that plaintiff submitted a claim under the CDA.

### B. Certification of the claim

■ As stated above, a contractor's claim which exceeds $50,000 must be properly certified. 41 U.S.C. § 605(c)(1) (1988). Plaintiff asserted that the issuance of a requisition voucher by the United States Army reserving funds internally for his claim, in fact, certified his claim. Such an argument is not supported by the CDA. Section 605(c)(7) of Title 41 states that "[t]he certification ... may be executed by any person duly authorized to bind the contractor with respect to the claim." 41 U.S.C. § 605(c)(7) (Supp. IV 1992). For example: "[i]f the contractor is an individual, the certification shall be executed by that individual." 48 C.F.R. § 33.-207(c)(1). Certification by an individual contractor is required to trigger "a contractor's potential liability for a fraudulent claim under [§] 604 of the Act." *Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426 (Fed.Cir.1989). In the instant case, plaintiff was the individual required to certify his claim. An internal reservation of annual funds for possible payment of a claim, signed by defendant—and not plaintiff—cannot make plaintiff personally liable for the accuracy of his claim and is no substitution for certification. The CDA requires plaintiff, through his own submissions to the contracting officer, to certify that his claim was made in good faith, was accurate, and complete.

■ Although certification is an essential element of a CDA claim, a defect in the certification of a claim does not deprive this court of jurisdiction over that claim. 41 U.S.C. §§ 605(c)(1), 605(c)(6) (1988 & Supp. IV 1992). Section 605(c)(6) provides a plaintiff with the opportunity to correct a defective certification. *Id.* Congress sought to allow contractors to cure "technically defective" certifications—defective as a result of innocent mistake—in order "to avoid repetition of the entire administrative claims process and waste of judicial ... resources." H.Rep. No. 102–1006, 102d Cong., 2d Sess. 28, *reprinted in* 1992 U.S.C.C.A.N. 3921, 3937. Examples of "technically defective" certifications that may be cured include:

> certification with each document submitted as part of the claim when all claim documentation is not submitted simultaneously[;] missing certifications when two or more claims not requiring certification are deemed by the court or board to be a larger claim requiring certification[;] and certification by the wrong or incorrect representative of the contractor (when the person making the certification was authorized by the contractor to certify on its behalf).

*Id.*

■ All the aforesaid examples share a common element; an attempt was made by

the claimant to certify the claim. Plaintiff, unlike those examples, never once attempted to certify his claim; he produced no certification, defective or otherwise. By providing for the correction of a defective certification, § 605(c)(6), *a fortiori*, requires a defective certification. A contractor must make a good faith effort "to provide a responsive certification in the first instance." *Id.* None of plaintiff letters contain, or attempt to contain, language affirming a good faith claim, accuracy, and completeness of data. Plaintiff's complete lack of certification is clearly a substantive defect because it is an "intentional disregard of the statutory certification requirements." *Id.* As such, plaintiff's lack of certification is not subject to correction pursuant to § 605(c)(6) of the CDA.

 While the issue of correction of a defective certification under § 605(c)(6) of the CDA is nonjurisdictional, the total lack of any certification, in the first instance, remains a jurisdictional prerequisite. A contrary reading of § 605 would constitute a repeal by implication of the certification requirement of the CDA. Because the doctrine of repeals by implication is not favored, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), the court finds that the certification requirement of § 605(c)(1) remains intact, as does prior case law holding that a lack of certification is a jurisdictional bar to the filing of a complaint in this court. *See Schlosser*, 705 F.2d at 1338–39; *Paragon Energy*, 645 F.2d 966, 227 Ct.Cl. at 184. To find otherwise thwarts the purpose behind certification. Allowing a contractor, any time prior to judgment, to provide certification in the first instance would permit a contractor to file and maintain suit against the United States Government without the potential risk of liability for fraud; in essence, a contractor could test the waters before deciding to dive in or not. If Congress intended such an outcome, then it would either have removed the certification requirement in § 605(c)(1), or specifically allowed a contractor to cure a lack of certification.

Albeit plaintiff's submissions were sufficient to qualify as a claim under the CDA, plaintiff failed to supply the minimum requirement, a defective, but curable, certification. Accordingly, without any credible attempt at certification, this court lacks jurisdiction over plaintiff's claim.

### CONCLUSION

For the reasons set forth above, this court lacks jurisdiction over plaintiff's claim and, defendant's motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1) is granted. The Clerk is directed to dismiss the complaint. No costs.

**IT IS SO ORDERED.**