SCAN–TECH SECURITY, L.P., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–601C.

United States Court of Federal Claims.

March 20, 2000.

---

Daniel E. Somers, Clemente, Dickson & Mueller, P.A., Morristown, New Jersey, for the Plaintiff.

Thomas O. Mason, Washington, D.C., with whom were James' M. Kinsella, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, and Frank W. Hunger, Assistant Attorney General, for the Defendant.

## OPINION

BUSH, Judge.

This matter is before the court on the defendant's motion to dismiss plaintiff's contract-based counts for lack of subject matter jurisdiction and plaintiff's takings count for failure to state a claim upon which relief can be granted. The issues to be decided are (1) whether plaintiff properly submitted a claim to the contracting officer for final decision in compliance with the requirements of the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–13 (1994) and (2) whether defendant has properly demonstrated that the parties' contractual relationship precludes plaintiff's takings claim from proceeding. Because plaintiff has completely failed to certify its claim in accordance with the CDA, the court dismisses plaintiff's contract-based counts. However, because defendant has failed to demonstrate that the parties' contract prevents plaintiff from asserting its takings claim, the court denies defendant's motion to dismiss as it relates to plaintiff's takings count.

## FACTS

The Federal Aviation Administration (FAA) and Scan–Tech Security L.P. (Scan–Tech) entered into Contract No. DTFA03–89–C–00044 on September 26, 1989. This cost-reimbursement contract required Scan–Tech to perform research as well as full-scale engineering and development of a non-nuclear, non-vapor detection system to be used to inspect airline luggage in airline terminals. The contract contemplated two work phases. Phase II required the construction of an x-ray scattering explosive detection device prototype. During performance, the parties entered into various formal contract modifications increasing the funding of these phases and adjusting their completion dates.

On July 1, 1993, the FAA ordered Scan–Tech to stop work so that Scan–Tech could perform a demonstration of the prototype. Leading up to this, Scan–Tech had met with the FAA on several occasions in early 1993 to discuss the continuation of the project and the further funding of it. As a result of these meetings, Scan–Tech submitted proposals, allegedly at the FAA's request, and in return received encouragement to proceed with work. On August 20, 1993, the parties entered modification number 12, which authorized the demonstration of the prototype and provided $150,000 in funding for the demonstration. Modification 13 definitized the $150,000 funding amount. Scan–Tech performed the "as is" demonstration of the prototype in September 1993, and at some unspecified point, delivered the prototype to the FAA at its own expense. On January 27, 1994, the FAA default terminated the contract.

Beginning in 1993, Scan–Tech submitted invoices to the FAA seeking reimbursement for cost overruns and expenses incurred in performing the contract. According to Hasbrouck Miller, the Vice–President of Control Screening Corporation (which was a general partner in the Scan–Tech Security limited partnership), Scan–Tech filed a "claim" with the Contracting Officer on or about June 21, 1994. Based on Scan–Tech's submissions to this court, this "claim" included Standard Form 1411 (SF 1411), the Contract Pricing Proposal Cover Sheet. SF 1411 listed a cost overrun on Phase II of the project as the type of contract action, and a Scan–Tech representative signed this standard form.

More than two years later, on September 17, 1996, Mr. Miller sent a letter to the FAA's contracting officer (CO), listing nine outstanding invoices. The invoice dates ranged from May 28, 1993 to September 16, 1996, and totaled $808,043, nearly the same amount of relief requested in Scan–Tech's present complaint. The subject of the September 17, 1996 letter was "Outstanding Billings for DTFA03–89–C–00044." In it, Mr. Miller stated that "[f]urther to ongoing correspondence and various conversations, please find the enclosed invoices and backup documentation for what I believe to be all the outstanding invoices for payments due to Scan–Tech for work performed for DTFA03–89–C–00044." Mr. Miller noted that he had "spent considerable time accumulating and checking the various invoices" and related his belief "that this is as complete an assembly as possible." In conclusion, Mr. Miller expressed that Scan–Tech was "anxious to put this matter to rest" and offered to "follow up with you in the next couple of days to discuss how we need to proceed."

By letter dated November 8, 1996, the FAA's CO, Michael King, responded to Scan–Tech's submission. In his responding letter, Mr. King authorized payment in the amount of $52,201.57 for the work that modification 12 ordered; much less than the $808,043 that Scan–Tech had requested. Def.'s App. 5. Mr. King reasoned that the "ceiling" price established by Modification 12 was $150,000 and since the FAA formerly had already approved payment in the amount of 97,798.43, Scan–Tech was only entitled to the remaining $52,201.57. In conclusion, Mr. King requested that Scan–Tech submit an invoice for $52,201.57, and identify that invoice as "final."

On August 28, 1997, Scan–Tech filed suit in this court, asserting five counts. In counts I to IV, Scan–Tech alleges that the Government failed to pay it for extra work the Government requested and approved in 1993. In addition, Scan–Tech asserts that the Government breached the contract by accepting work, including that associated with the delivery of the prototype, without paying Scan–Tech. In count V, Scan–Tech asserts that the acceptance of the prototype without payment constitutes a taking without just compensation.

## DISCUSSION

**I. Motion to Dismiss for Lack of Jurisdiction—RCFC 12(b)(1)**

The Government has moved to dismiss counts I to IV for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). The focus of the Government's argument is that Scan–Tech failed to certify its written submission to the CO. However, because compliance with the CDA affects this court's

jurisdiction, the court will analyze Scan–Tech's submissions to insure that they meet all of the CDA's requirements, not simply the certification provision.

Jurisdiction may be challenged by the parties or by the court on its own motion at any time, and if jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3). When considering a motion to dismiss, this court must assume all undisputed factual allegations to be true and draw all reasonable inferences in favor of the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). When a party challenges jurisdiction, the non-moving party bears the burden of proving disputed jurisdictional facts by a preponderance of the evidence. *Reynolds*, 846 F.2d at 748. Although a decision on a motion to dismiss pursuant to RCFC 12(b)(1) is not a judgment on the merits, *Mark Smith Constr. Co. v. United States*, 10 Cl.Ct. 540, 541 (1986), the court may make any factual findings necessary to adjudicate this motion, *Reynolds*, 846 F.2d at 747, including findings on matters not raised in the pleadings. *Indium Corp. of America, Inc. v. Semi–Alloys, Inc.*, 781 F.2d 879, 884 (Fed.Cir.1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986).

The Tucker Act delineates this court's jurisdiction, and limits it to claims predicated on the Constitution, act of Congress, regulation promulgated by the executive department, or any express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (1994). Scan–Tech, in its present complaint, asserts jurisdiction based on its compliance with the CDA in seeking to adjudicate its contract dispute with the FAA. The CDA applies to express or implied contracts with executive agencies for services or property other than real property in being. 41 U.S.C. § 602(a) (1994) (defining scope of Act). As Scan–Tech's express or implied contract was entered with the FAA, an "executive agency," and was for services associated with the production of the prototype, this dispute properly comes within the scope of the CDA. *See* 41 U.S.C. § 601(2) (defining executive agency for purposes of Act).

Plaintiff must adhere to the procedural requirements of the CDA for this court to assume jurisdiction of its claim. *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338–39 (Fed.Cir.1983). The CDA requires a contractor to submit a written "claim" along with a certification to the contracting officer for a final decision. 41 U.S.C. § 605. In the present case, the parties do not dispute that Mr. King, the Contracting Officer received written submissions from Scan–Tech. Rather, the issues to be decided are: (1) whether Scan–Tech's written submissions constitute a "claim" for purposes of the CDA, and if so (2) whether Scan–Tech certified its claim.

## A. Whether Scan–Tech's Submissions Constitute a Claim

 While the CDA does not define the quintessential term "claim," its implementing regulations do:

> "Claim," as used in this subpart, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and 33.207. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

48 C.F.R. § 33.201 (1999). The Federal Circuit, in an en banc opinion, has established an analysis to determine whether a CDA claim exists for jurisdictional purposes. *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir.1995) (en banc). Because the Federal

Acquisition Regulation (FAR) expressly excludes a "routine request for payment" from the definition of claim, the court's first step is to ascertain whether the request for payment is routine or nonroutine. *Id.* at 1576–77. If the request is nonroutine, the requirements are that the claim "be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." *Id.* at 1575. Additionally, the claim must, either explicitly or implicitly, request a contracting officer's final decision. *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1542 (Fed.Cir.1996). There is no requirement that a dispute exist at the time of submission for the nonroutine request to be considered a claim. *Reflectone*, 60 F.3d at 1576. Conversely, if the request for payment is routine, then different requirements apply. *Id.* at 1577–78. Under the FAR's definition, a dispute must exist at the time of submission or the Government must unreasonably delay in paying the request and the contractor must notify the CO in writing that it is submitting a claim for the routine request to ripen into a claim under the CDA. *See* 48 C.F.R. § 33.201; *see also Reflectone*, 60 F.3d at 1578; ROBERT T. PEACOCK & PETER D. TING, CONTRACT DISPUTES ACT ANNOTATED 4–20 (1998).

### 1. Whether Scan–Tech's Submissions Constitute a Routine or Nonroutine Request for Payment

■ The court first must determine whether Scan–Tech's request for the FAA to pay it over $808,000 was routine or nonroutine.[1] A routine request "is made under the contract, not outside of it[;]" whereas, a nonroutine request is a "demand for compensation for unforeseen or unintended circumstances." *Reflectone*, 60 F.3d at 1577. Examples of nonroutine requests for payment are a request for equitable adjustment, *id.*, termination for convenience settlement proposal, *Ellett Constr.*, 93 F.3d at 1542; *Medina Constr., Ltd. v. United States*, 43 Fed.Cl. 537, 546 (1999), submission seeking return of property, *J & E Salvage Co. v. United States*, 37 Fed.Cl. 256, 261 n. 4 (1997), *aff'd*, 152 F.3d 945, 1998 WL 133265 (Fed.Cir.), *cert. denied*, 525 U.S. 827, 119 S.Ct. 76, 142 L.Ed.2d 59 (1998), submission disputing the Government's planned setoff, *Hamilton Sec. Advisory Servs., Inc. v. United States*, 43 Fed.Cl. 566, 576 (1999), and a submission asserting breach of contract. *Kentucky Bridge & Dam, Inc. v. United States*, 42 Fed.Cl. 501, 519 (1998). Examples of routine requests are invoices for completed work, 48 C.F.R. § 33.201; requests for scheduled progress payments, *Ellett Constr.*, 93 F.3d at 1542, and vouchers for disbursement under a cost-reimbursement contract. *See General Dynamics Corp.*, ASBCA No. 25,919, 82–1 BCA ¶ 15,-616, at 77,105–06, 1982 WL 54107 (1982) (concluding that routine vouchers are not claims and do not require certification).

■ Based on these examples, it appears that a spectrum of requests can be envisioned with vouchers and invoices anchoring the "routine" pole on this spectrum and requests for equitable adjustment and similar requests establishing the "nonroutine," or opposite pole. The court's task will be to determine towards which pole Scan–Tech's submissions tend. Unfortunately, the overwhelming majority of the examples the court has culled from the case law pertain to fixed-price contracts, which the Government administers much differently than cost-reimbursement contracts.[2] Accordingly, understanding the administration of cost-reimbursement contracts is crucial in ascertaining whether Scan–Tech's submissions constitute a routine or nonroutine request for payment.

Unlike a fixed-price contract, a cost-reimbursement contract's scope of work typically is less detailed and the Government's involve-

---

1. In determining whether Scan–Tech's submissions constitute a proper CDA claim, the court will consider Scan–Tech's June 21, 1994 submission and its September 17, 1996 submission collectively. *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592–93 (Fed.Cir. 1987); *Hamza v. United States*, 31 Fed.Cl. 315, 321 (1994).

2. The one example involving a cost-reimbursement contract, *General Dynamics Corp.*, was decided well before the Federal Circuit decided *Reflectone*, and therefore offers limited, if any, utility.

ment is more focused on controlling the contractor's level of expenditure, rather than monitoring the contractor's progress and conformity with the specifications. JOHN CIBINIC, JR. & RALPH C. NASH, JR., COST-REIMBURSEMENT CONTRACTING 929 (2d ed.1993). To enable the Government to control the contractor's expenditures, cost-reimbursement contracts contain either the Limitation of Cost clause (LOC), if they are fully funded at inception, or the Limitation of Funds clause (LOF), if they are incrementally funded. *Id.* at 931–36; *see* 48 C.F.R. § 52.232–20 (1989) (LOC); 48 C.F.R. § 52.232–22(LOF). A cost-reimbursement contract must contain one clause or the other. 48 C.F.R. § 32.705–2 (1989).

Both clauses require the contractor to provide notice of any expected cost overrun. 48 C.F.R. § 52.232–20(b)(LOC); 48 C.F.R. § 52.232–22(c)(LOF). The contractor can recover the anticipated overrun, subject to the following three conditions:

> (1) ... the contractor [must] notify the government in writing when it anticipates that within the next sixty days it will exceed seventy-five percent of the estimated cost and provide a revised estimate; (2) ... the contracting officer [must] notify the contractor in writing that the estimated cost has been increased by a specific amount; and (3) ... until the contracting officer gives such notice, the contractor is not required to continue performance or incur costs that exceed those estimated in the contract.

*Advanced Materials, Inc. v. Perry,* 108 F.3d 307, 310 (Fed.Cir.1997). In the event the contractor does not receive the Government's advanced approval, the contractor has the right to refuse work that will cause it to exceed the estimated costs. *Id.* However, absent the fulfillment of the above conditions, the Government is not obligated to reimburse the contractor for any overrun. *Id.* at 310–11; 48 C.F.R. § 52.232–20(d)(1)(LOC); 48 C.F.R. § 52.232–22(e)(LOF). The Contracting Officer has discretion to approve funding

for the overrun, modify the contractor's work so as to prevent the overrun, or terminate the contract. 48 C.F.R. § 32.704; CIBINIC & NASH, *supra,* at 947. If the Government issues a change order, thereby modifying the contractor's work, it does not *per se* authorize an increase in the contract's funding. 48 C.F.R. § 52.232–20(g)(LOC); 48 C.F.R. § 52.232–22(j)(LOF). Rather, the three standard conditions must be satisfied for the contractor to receive increased contract funding, although as one of the three conditions, the contractor retains the right to refuse work if the changed work will exceed the contract's estimated costs. *Titan Corp. v. West,* 129 F.3d 1479, 1481 (Fed.Cir.1997). Overall, the administration of a cost-reimbursement contract involves significant contractor-Government communication during performance to insure that proper funding is maintained.

Against this background of cost-reimbursement contracting, it would appear that a notice of cost overrun represents a contemplated, regularly occurring facet of cost-reimbursement contract administration. However, Scan–Tech's June 21, 1994 submission, which it identified as "Cost Overrun on CXRS Phase II Project—Aviation Security," bears characteristics which make it appear nonroutine in the administration of a cost-reimbursement contract.[3] First, according to Scan–Tech's complaint, which the Government does not challenge at this time, the genesis of Scan–Tech's cost overrun was the Government's encouragement to perform additional work and continue to work under the contract despite an anticipated shortfall in funding. Yet, under a cost-reimbursement contract, the contractor is not obligated to perform work that would result in it surpassing the contract cost estimates. Second, Scan–Tech submitted its notice of cost overrun nearly five months after the Government terminated the contract, not during the active administration of the contract when Scan–Tech incurred or anticipated incurring the costs. While the timing of the submission alone would not be determinative,[4] it

---

**3.** The express, limited purpose of the court's analysis here is to determine whether Scan–Tech submitted a non-routine request. Nothing in this analysis should be construed as a statement by

the court on the merits of Scan–Tech's contract claims.

**4.** For example, a routine invoice for scheduled work could be submitted after the contract's ter-

underscores the atypical nature of Scan–Tech's request. Notice of overruns are envisioned in the contract as operating prospectively, not retrospectively. *Advanced Materials*, 108 F.3d at 310–11.

The characteristics of Scan–Tech's June 21, 1994 submission parallel those in a request for equitable adjustment more than those in a routine submission generated in the course of scheduled contract work. Scan–Tech's request for payment appears to seek a remedy predicated on the occurrence of an unforeseen circumstance, i.e., the Government's encouragement of Scan–Tech to perform additional work without commensurate reimbursement. *See Ellett Constr.*, 93 F.3d at 1542; *Reflectone*, 60 F.3d at 1577. While the contract contemplated that overruns may occur and set forth established procedures with regard thereto, it also incorporated preconditions regarding those overruns, such as the contractor giving notice, the contracting officer granting approval, and the contractor stopping work rather than incurring additional costs. According to Scan–Tech's complaint, these preconditions apparently did not occur in this case. In other words, just as a contract may contain a differing site condition clause or a termination for convenience clause, and a contractor's related request would still be nonroutine, *see Ellett Constr.*, 93 F.3d at 1542–43; *Reflectone*, 60 F.3d at 1577, Scan–Tech's notice of cost overrun submission is nonroutine, notwithstanding the presence of a cost limitation provision that provided for such a notice.[5] Therefore, the court finds that Scan–Tech's June 21, 1994 submission and its reiteration on September 17, 1996 collectively amount to a nonroutine request for payment.

### 2. Whether Scan–Tech's Submissions Amount to a Written Demand Seeking as a Matter of Right a Sum Certain

Having determined that Scan–Tech's request for payment was nonroutine, Scan–

Tech's submissions did not have to be "in dispute" at the time of submission for the court to consider them a claim. These submissions, however, must embody "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." *Reflectone*, 60 F.3d at 1575. First, Scan–Tech's June 21, 1994 and September 17, 1996 submissions clearly were "written demands." Second, in its September 17, 1996 letter, Scan–Tech's representative stated that the invoices he included were "what I believe to be all of the outstanding invoices for payments due to Scan–Tech for work performed for DTFA03–89–C–00044." This statement demonstrates that Scan–Tech's written demand was seeking payment as a matter of right. *See Davies Precision Machining, Inc. v. United States*, 35 Fed.Cl. 651, 664 (1996) (interpreting *Reflectone* to describe a "matter of right" as a demand for something believed to be due). Third, both of Scan–Tech's submissions request a sum certain of payment.

### 3. Whether Scan–Tech Requested a Final Decision

 Nevertheless, to be considered a proper CDA claim, Scan–Tech's submissions must have, either explicitly or implicitly, requested a contracting officer's final decision. *Ellett Constr.*, 93 F.3d at 1542; *Sam Gray Enters. v. United States*, 32 Fed.Cl. 526, 529 (1995); *Fisherman's Boat Shop, Inc.*, ASBCA No. 50324, 97–2 BCA ¶ 29,257, at 145,556, 1997 WL 593934 (1997). Scan–Tech did not expressly request a final decision from the contracting officer; therefore, the remaining issue is whether Scan–Tech's submissions and the circumstances surrounding them imply a desire for a contracting officer's final decision.

 "As long as the basic requirements of the CDA are met, and the contracting

---

mination date, yet would still be considered a routine request. *See Reflectone*, 60 F.3d at 1577; 48 C.F.R. § 33.201 (referencing invoices as a routine request for payment).

5. Neither party has furnished the court with the contract. Nevertheless, the court can surmise that the contract contained either the LOC or

LOF clause, pursuant to 48 C.F.R. § 32.705–2 (1989) or as a result of the *Christian* doctrine. *G.L. Christian & Assocs. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, 427 (1963), *reargument denied*, 160 Ct.Cl. 58, 320 F.2d 345 (1963), *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

officer knows the bases of the claims and the final amounts sought, the 'request' for a final decision may be inferred from the circumstances of the case." *Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 443 (1993). The fact that the contractor may express a desire to settle or negotiate the dispute or meet with the Government to discuss the matter will not necessarily prevent a finding that the contractor's submissions requested a final decision. *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1577–78 (Fed. Cir.1992), *overruled on other grounds, Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir.1995) (en banc);[6] *Contract Cleaning Maintenance*, 811 F.2d at 592. Scan–Tech's September 17, 1996 letter to the contracting officer implicitly requested a final decision. Scan–Tech's representative stated that Scan–Tech was "very anxious to put this matter to rest and move on to other projects." This statement suggests a desire for finality, which only a contractor officer's final decision could provide. Scan–Tech's offer to answer any questions and "follow up" with the contracting officer "to discuss how we need to proceed" does not nullify Scan–Tech's desire to obtain a final decision. Furthermore, the circumstances of Scan–Tech's September 17, 1996 submission demonstrate that Scan–Tech intended a final decision. The September 17, 1996 submission came more than two years after Scan–Tech's initial, formal submission to the contracting officer requesting the payment of over $808,000. After more than two years without payment, a reasonable contractor would not simply submit a request for payment of a sum certain, taking the time to compile invoices and other supporting documentation, without at least implicitly requesting a final decision from the contracting officer as to its entitlement to that quantum. *See Transamerica*, 973 F.2d at 1578; *P.J. Dick, Inc. v. General Servs. Admin.*, GSBCA No. 12052, 94–1 BCA ¶ 26,276, at 130,735, 1993 WL 285931 (1993). The contracting officer's response, while not formally captioned as a "final decision," nevertheless conclusively stated the Government's position regarding Scan–Tech's entitlement.

Therefore, the court holds that Scan–Tech's submissions constitute a nonroutine request for payment. These submissions are a written demand seeking a sum certain as a matter of right, and implicitly request a contractor officer's final decision. Accordingly, for Scan–Tech's submission to be considered a proper claim under the CDA sufficient for this court to assert jurisdiction, it must satisfy the CDA's certification requirement.

**B. Whether Scan–Tech Certified its Claim**

■ The CDA currently requires that a claim in excess of $100,000 must be certified. 41 U.S.C. § 605(c)(1). The CDA mandates the following certification language:

> the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

*Id.; see* 48 C.F.R. § 33.207(c). The purpose underlying the certification requirement is to create the deterrent of potential liability for fraud and thereby discourage contractors from submitting unwarranted or inflated claims. *See Fischbach & Moore Int'l Corp. v. Christopher*, 987 F.2d 759, 763 (Fed.Cir. 1993); *Transamerica Ins. Corp.*, 973 F.2d at 1579; *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 685 F.2d 414, 418 n. 11 (1982).

An exact recitation of the CDA's boilerplate certification language is not required. *Fischbach & Moore Int'l Corp.*, 987 F.2d at 763. In fact, as a result of a 1992 amendment, the CDA provides that a "defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim." 41 U.S.C. § 605(c)(6). Rather, the court must require

---

**6.** To the extent *Transamerica* required a contractor to demonstrate a preexisting dispute for its nonroutine submission to constitute a CDA claim, it has been overruled by *Reflectone. Reflectone*, 60 F.3d at 1579 n. 10. However, the proposition for which this court cites *Transamerica* is still good law, as evident in the *Ellett* court's reliance on it. *Ellett Constr.*, 93 F.3d at 1543.

the contractor to correct the defective certification prior to the entry of final judgment. *Id.* While the CDA does not define "defective certification," the regulations specify that a defective certification is "a certificate which alters or otherwise deviates from the language in 33.207(c) [standard certification language] or which is not executed by a person duly authorized to bind the contractor with respect to the claim." 48 C.F.R. § 33.201. The legislative history of the amendment provides further clarification, referring to the intended coverage of "defect" as "technically defective" in contradistinction to a "substantive defect, such as bad faith, fraud, or reckless and intentional disregard of the statutory certification requirements." H.R. REP. No. 102–1006, at 28 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3921, 3937. In sum, the amended CDA permits "contractors to cure a defective certification, but not to waive the certification requirement altogether." *J & E Salvage,* 37 Fed.Cl. at 263.

A contractor must make some good faith attempt at a responsive certification in the first instance for this court to find a defective certification. *Pevar Co. v. United States,* 32 Fed.Cl. 822, 825 (1995); *Hamza v. United States,* 31 Fed.Cl. 315, 324 (1994). The legislative history buttresses this requirement, revealing that the intent of the amendment is to prevent a contractor from being penalized where the defect in its certification is a "result of innocent mistake or inadvertence[,]" and "a good faith effort appears to have been made to provide a responsive certification in the first instance...." H.R. REP. No. 102–1006, at 28. In requiring an initial, good faith effort, this court will not accept a contractor's after-the-fact attempt to claim a defective certification has been made if that alleged certification contains merely a modicum of similarity to the standard CDA certification language. *Sam Gray Enters.,* 32 Fed.Cl. at 530.

The thrust of the Government's motion to dismiss is that Scan–Tech failed to certify its claim, thereby failing to satisfy the requirements of the CDA, and that consequently, this court does not have jurisdiction to entertain Scan–Tech's contract claims. Scan–Tech counters that it submitted a defective certification, and that following the 1992 amendment to the CDA, a defective certification is sufficient for the court to assume jurisdiction, provided the defect is corrected later. Furthermore, Scan–Tech asserts that, under recent case law, the certification requirement has been eliminated, and thus should not pose as a barrier to the jurisdiction of this court. Finally, Scan–Tech argues that it provided a proper certification in the Appendix to its motion and therefore the certification issue is moot. Because the court rejects each of Scan–Tech's arguments, the court rules that Scan–Tech has failed to carry its burden of demonstrating jurisdiction. Scan–Tech's three arguments will be addressed in turn.

**1. Whether Scan–Tech's Submissions Included Language Sufficient to Constitute a Defective Certification**

■ Scan–Tech first argues that it submitted a defective certification. Scan–Tech points to its submission of SF 1411 on June 21, 1994 as evidence of its attempt to certify its claim. Scan–Tech also adds that its September 17, 1996 letter to the contracting officer noted that its submission was "complete." While Scan–Tech apparently would have the court consider its SF 1411 and September 17, 1996 letter together to determine if its claim was certified properly, the court is unwilling to do so for the singular reason that an acceptable CDA certification must be made simultaneously, not in a piecemeal fashion. *D.L. Braughler Co. v. West,* 127 F.3d 1476, 1480 (Fed.Cir.1997); *W.H. Moseley Co. v. United States,* 230 Ct.Cl. 405, 677 F.2d 850, 852 (1982), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982); *Medina Constr.,* 43 Fed.Cl. at 547. Accordingly, the court must examine the SF 1411 and the September 17, 1996 letter individually to determine whether either constitutes a certification sufficient to confer jurisdiction on this court.

**a. Standard Form 1411**

■ Scan–Tech contends that it attempted to certify its claim when it submitted SF 1411, which contained an averment that the costs included were actual costs or estimates.

Pl.'s Opp'n to Def.'s Mot'n Dismiss, at 7. Scan–Tech utilized SF 1411 to request reimbursement from the Government for a cost overrun that allegedly had occurred in the prior year. According to the plain language of SF 1411, it can be used for a variety of contract actions, but commonly a contractor submits SF 1411 to provide the contracting officer with cost or pricing data in support of a pre-award contract proposal or a substantial contract modification.[7] SF 1411 is actually a cover sheet. *See* 48 C.F.R. § 53.301–1411 (1994) (providing form). It is technically not a "certificate;" rather, after the parties reach a price agreement, the contractor is to complete the "Certificate of Current Cost or Pricing Data" and thereby expressly certify that the cost or pricing data submitted are current, accurate, and complete.[8]

Prior to the 1992 CDA amendments, SF 1411 was found to be insufficient to represent a CDA certification. *See Appeal of Fire Sec. Sys., Inc.*, V622C–514, VABCA No. 2901, 89–2 BCA ¶ 21,711, at 109, 162–63, 1989 WL 27903 (1989); *see also Aeronetics Div., AAR Brooks & Perkins Corp. v. United States*, 12 Cl.Ct. 132, 135–36 (1987) (refusing to accept DD Form 633, which is very similar to SF 1411, as a substitute for the CDA certification). Furthermore, the closely-related Certificate of Current Cost or Pricing Data also was found to be unacceptable to serve as a CDA certification. *See Appeal of H & S Corp.*, VABCA No. 3132, 90–1 BCA ¶ 22,635, at 113,528 (1990); *ReCon Paving, Inc.*, ASBCA No. 27,836, 83–2 BCA ¶ 16,658, at 82,834, 1983 WL 13056 (1983), *aff'd in part, rev'd on other grounds*, 745 F.2d 34 (Fed.Cir. 1984). Following the 1992 amendments,

however, this court and other tribunals have determined that the certification language found in another standard form, SF 1436,[9] is sufficiently similar to the CDA certification to permit jurisdiction. *See Ellett Constr.*, 93 F.3d at 1545; *Medina Constr.*, 43 Fed.Cl. at 547–48; *see also Walashek Indus. & Marine, Inc.*, ASBCA No. 52,166, 2000 WL 11877 (Jan. 6, 2000); *Metric Constructors, Inc.*, ASBCA No. 50,843, 98–2 BCA ¶ 30,088, at 148,940, 1998 WL 758397 (1998). Based on these cases, it is clear that a standard form with a similar certification to the CDA's can satisfy the certification threshold necessary for the court to exercise jurisdiction. The question therefore is whether SF 1411, like SF 1436, bears similar characteristics to the standard CDA certification sufficient to meet this jurisdictional threshold.

Because SF 1411 does not contain language that remotely corresponds to that of the CDA and because the context in which SF 1411 is submitted makes it totally unsuitable to serve as a CDA certification, the court rejects Scan–Tech's attempt to rely on SF 1411 as a defective certification. Comparing the relevant language in SF 1411, SF 1436, and the CDA, it immediately becomes plain that SF 1411 does not bear sufficient semblance to the CDA-required language for the court to find it constitutes even a defective certification. The critical language in Scan–Tech's SF 1411 states:

> This proposal is submitted in response to the RFP, contract, modification, etc. in item 1 and reflects our best estimates and/or actual costs as of this date and conforms with the instructions in FAR

---

7. *See* 48 C.F.R. § 15.804–6(b) (1994) (requiring submission of cost and pricing data on SF 1411 and providing instructions for completion); 48 C.F.R. § 53.215–2 (1994) (generally prescribing the use of SF 1411); *see generally* 10 U.S.C. § 2306a (1994) (generally requiring the submission of cost or pricing data for negotiated contracts over a certain threshold); 41 U.S.C. § 254b (1994) (same); 48 C.F.R. § 15.804–2 (1994) (same). On September 30, 1997, Part 15 of the Federal Acquisition Regulation, largely was re-written and as a result, SF 1411, and the requirement that it be submitted, were eliminated. *See* Contracting by Negotiation and Competitive Range Determination, 62 Fed.Reg. 51,224, 51,225 (Sept. 30, 1997).

8. *See* 48 C.F.R. § 15.804–4 (1994). Under the re-written FAR Part 15, a contractor is required to submit a Certificate of Current Cost or Pricing Data if cost or pricing data are required. *See* 48 C.F.R. § 15.406–2 (1999).

9. SF 1436 is the standard form used to submit a termination settlement proposal following the Government's convenience termination of a fixed-price contract, if the contractor submits its proposal on a total cost basis. 48 C.F.R. § 49.602–1 (1999) (prescribing the use of SF 1436); 48 C.F.R. § 53.249(a)(3) (same); *see also* 48 C.F.R. § 49.104(h) (requiring contractor to submit a settlement proposal following convenience termination).

15.804–6(b)(2), Table 15–2. By submitting this proposal, the offeror, if selected for negotiation, grants the contracting officer or an authorized representative the right to examine, at any time before award, those books, records, documents, and other types of factual information, regardless of form or whether such supporting information is specifically referenced or included in the proposal as the basis for pricing, that will permit an adequate evaluation of the proposed price.

*Id.* In contrast, SF 1436 begins: "[t]his is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this termination settlement proposal and that, to the best knowledge and belief of the undersigned...." Similar to SF 1436, the CDA certification begins: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief...." 48 C.F.R. § 33.207(c). Whereas SF 1436 and the CDA certification begin with the key word to any certification, "certify," and also share the significant words "best knowledge," and "belief," SF 1411 makes no mention of these words. The only part of SF 1411 that remotely resembles a certification is the averment "reflects our best estimates and/or actual costs." While such an averment could be construed as a certification of the completeness and accuracy of the supporting data, it would be disingenuous to construe that phrase to find an implicit certification that the claim was submitted in good faith, for an amount for which the Government is liable. *Compare* 48 C.F.R. § 53.301–1411 (1994) (text of SF 1411), *with* 41 U.S.C. § 605(c)(1)(CDA). In sum, SF 1411 does not simply "alter or otherwise deviate from" the standard certification language, as the definition of defective certification provides. *See* 48 C.F.R. § 33.201. "Alter" and "deviate" imply some relationship to the original from which they depart; whereas SF 1411, unlike SF 1436, bears no relation to the CDA certification language.

In addition, SF 1411 lacks the contextual attributes of SF 1436 that would allow the court to uphold SF 1411 as a correctable certification. First, SF 1411, unlike SF 1436, does not expressly contain a "certificate."

*Compare* 48 C.F.R. § 53.301–1411 (1994), *with* 48 C.F.R. § 53.301–1436 (1999). Instead, the Certificate of Cost and Pricing Data, closely related to SF 1411, represented the relevant certificate to be filed when the requirement for a SF 1411 existed. *See* 48 C.F.R. § 15.804–4 (1994). Second, because of its intended use in negotiations, SF 1411's averment does not contain absolute language, but instead provides that the attached information "reflects our *best estimates and/or* actual costs...." 48 C.F.R. § 53.301–1411 (emphasis added). SF 1411's averment of "best estimates," phrased in the alternative of actual costs, is incompatible with the unequivocal concept inherent in a CDA certification. *See Ingersoll–Rand Co. v. United States,* 24 Cl.Ct. 692, 694 (1991) (rejecting a proffered certification because of its equivocal language). Third, the submission of SF 1411, in and of itself, does not imply Government liability because it is not required to be submitted as a notification of a cost overrun, and a contractor can use SF 1411 for several different contract actions as the face of the form makes plain. Conversely, the context in which SF 1436 is submitted clearly implies Government liability because the regulations require a contractor to submit SF 1436 following the Government's unilateral, convenience termination of the contract, *see* 48 C.F.R. § 49.602–1; 48 C.F.R. § 49.104(h); 48 C.F.R. § 53.249(a)(3), and a contractor only would submit SF 1436 for this purpose. Fourth, unlike SF 1436 and the contractor's termination for convenience settlement proposal that it encompasses, the regulations do not contemplate that SF 1411 will ripen automatically into a CDA claim if the parties reach an impasse in their negotiations. *Cf. Ellett Constr.,* 93 F.3d at 1544 (ruling that the FAR contemplated that a termination settlement proposal would ripen into a claim if impasse occurred). For these four contextual reasons, as well as SF 1411's paucity of language similar to the CDA certification, the court declines to accept Scan–Tech's SF 1411 as a correctable CDA certification sufficient for this court to retain jurisdiction.

**b. Letter of September 17, 1996**

█ Scan–Tech also asserts that its September 17, 1996 letter to the contracting officer declared that its submission was "complete." The sentence in which the word

"complete" appears states: "I have spent considerable time accumulating and checking the various invoices and related material and trust that this is as complete an assembly as possible." Def.'s App. 2. Like Scan–Tech's SF 1411, nothing in this letter could be construed to provide that the claim was made in good faith and accurately reflects an amount for which the Government is liable. *See* 41 U.S.C. § 605(c)(1). Furthermore, Scan–Tech's inclusion of the word "complete" resulted more from coincidence than an affirmative attempt to certify its claim pursuant to the CDA. *See Sam Gray Enters.*, 32 Fed.Cl. at 530 (finding plaintiff's inclusion of "good faith" to be coincidental and therefore insufficient). For this court to equate the common closing remark "[I] trust that this is as complete an assembly as possible" with a binding certification that carries potential liability for fraud would allow contractors, after-the-fact, to assert, without the apprehension of liability, that a rather banal statement constitutes a CDA certification. Thus, to accept Scan–Tech's closing remark as a CDA certification would emasculate the deterrent purposes that the certification is intended to achieve. Accordingly, this court is unwilling to consider this woefully inadequate language to be a defective certification sufficient for this court to exercise jurisdiction.

In sum, the court rules that neither Scan–Tech's SF 1411 nor its correspondence of September 17, 1996 constitute a defective, yet curable certification. Neither of these documents represent a good faith attempt at a responsive certification in the first instance. *See* H.R. REP. No. 102–1006, at 28. The substantive defects in these documents result from a complete disregard of the CDA's certification requirement, and not from an innocent oversight or mistake. Scan–Tech's allegation that these documents represent defective certifications is an unconvincing, after-the-fact attempt to satisfy the certification requirement. Consequently, the court must reject Scan–Tech's first argument.

### 2. Whether Recent Case Law Has Eliminated the CDA's Certification Requirement

In its second argument, Scan–Tech contends that recent case law effectively has abrogated the CDA's certification requirement. Scan–Tech cites the Federal Circuit's, *James M. Ellett Construction Co. v. United States*, 93 F.3d 1537 (Fed.Cir.1996), and this court's, *J & E Salvage Co. v. United States*, 37 Fed.Cl. 256 (1997), to support its proposition. The context of the Federal Circuit's pronouncement in *Ellett Construction* that "certification of the [termination for convenience settlement] proposal was not a jurisdictional prerequisite" reveals that the Federal Circuit did not abrogate the CDA's certification requirement. *Ellett Constr.*, 93 F.3d at 1546. In *Ellett Construction*, the Federal Circuit first held that a termination for convenience settlement proposal constitutes a nonroutine request for payment, and second held that such a proposal ripens into a CDA claim upon the parties reaching an impasse in their negotiations. *Id.* at 1542–44. As to the second part of the court's holding, the Government argued that Ellett's certification was improper because Ellett submitted its certification prior to the parties reaching impasse. *Id.* at 1544. The court's response to this specific Government argument was the context in which it stated that "certification of the proposal was not a jurisdictional prerequisite." *Id.* at 1546.

The Federal Circuit rejected the Government's argument. It first recognized that Ellett's SF 1436, submitted with the settlement proposal, contained very similar language to the CDA certification. *Id.* at 1545. It next noted that the 1992 amendments to the CDA allowed this court to assume jurisdiction over defective certifications. *Id.* Earlier in its decision, the court had determined that the contractor need not submit a new CDA claim, or otherwise convert its proposal into a claim at the time the parties reached an impasse in negotiating the settlement proposal. *Id.* at 1544–45. The Federal Circuit therefore determined that the court properly had jurisdiction apparently because the contractor was not required to submit a new certification at the point of impasse, and the certification contained in SF 1436 was sufficient to confer jurisdiction in light of the 1992 amendments to the CDA. *Id.* at 1545–

46. In this context, nothing in the Federal Circuit's decision should be found to alter the CDA's certification requirement. In fact the court's unequivocal statement that "the termination settlement proposal must be certified in accordance with the CDA" should eliminate any assertion that the court disturbed the CDA's certification requirement.[10]

More importantly, Scan–Tech's argument regarding the effectiveness of the CDA's certification requirement disregards the plain language of the statute, its implementing regulations, and the legislative history of the 1992 amendment. Neither *Ellett Construction* nor *J & E Salvage* overturned 41 U.S.C. § 605(c) which requires a contractor to certify its claim, if in excess of $100,000. Bolstering the effectiveness of the certification requirement, the implementing regulations augment the definition of "claim" to require certification. 48 C.F.R. § 33.201. Significantly, the regulations' definition of defective certification specifies "[f]ailure to certify shall not be deemed to be a defective certification." *Id.* This definition effectively prevents a contractor from completely circumventing the certification requirement by asserting that its failure to certify merely constituted a defect in certification that should not deprive the court of its jurisdiction. *See generally Medina Constr.*, 43 Fed. Cl. at 547. In closing this loophole, the regulation underscores the requirement that some good faith attempt at certification occur. Lastly, the legislative history of the amendment confirms that the language in the amendment "would not eliminate the certification requirement." H.R. REP. No. 102–1006, at 28.

3. **Whether the Certification Provided after the Commencement of Litigation is Sufficient to Confer Jurisdiction**

■ Scan–Tech's third argument contends that, by including a certification in the

Appendix to its Brief, it has rendered moot the Government's motion to dismiss. To support its argument, Scan–Tech cites a passage from *United Sales, Inc. v. United States*, 34 Fed.Cl. 88 (1995):

> The Act, however, obviates the need for dismissal of uncertified claims, which under the previous statutory framework, had to be refiled following certification and were subject to a new filing fee. Following the 1992 amendments, the court may retain jurisdiction over a timely filed claim and stay proceedings while proper certification is perfected.

*Id.* at 95. This passage, like the passage in *J & E Salvage* upon which Scan–Tech relies, is *dicta*.[11] In *United Sales*, the court expressly notes that the 1992 amendments to the CDA did not apply to United Sales' purported claim, because United Sales made its submissions well before the effective date of those amendments. *Id.* at 96. Therefore, the court's explication of the 1992 amendments was nonessential to its ruling.

In addition to the court's reservations to adopting such *dicta*, there are strong reasons for rejecting Scan–Tech's arguments. For the court to allow a contractor to correct its complete failure to certify after filing in this court would equate a lack of certification with a defective certification. To the contrary, the definition of "defective certification" expressly excludes a failure to certify from its meaning. 48 C.F.R. § 33.201. Furthermore, House Report 1006, in discussing the 1992 amendment, did not list a complete failure to certify as an example of a "technically defective" certification. H.R. REP. No. 102–1006, at 28. Scan–Tech's argument would present other problems in addition to contradicting the FAR's definition and ignoring Congress' intent. In *Hamza*, this court

---

10. *Id.* at 1545. Scan–Tech additionally cites *J & E Salvage* to support its argument. *J & E Salvage* offers statements questioning the requirement of certification as a result of *Ellett Construction,* but these statements are merely *dicta,* nonessential to the court's holdings. Any doubt created in the aftermath of *Ellett Construction* and *J & E Salvage* was not evident in the court's recent ruling in which it confirmed that "[t]he absence of certification on a claim in excess of

$100,000.00 is fatal to jurisdiction." *Hamilton Sec. Advisory Servs.*, 43 Fed.Cl. at 576 (holding that plaintiff's letters do not constitute a CDA claim in part because there was a complete lack of certification).

11. For this court's analysis of *J & E Salvage* see *supra* note 8.

succinctly summarized the legal and prudential dangers associated with permitting a contractor to file a claim without any attempt at certification:

> While the issue of correction of a defective certification under § 605(c)(6) of the CDA is nonjurisdictional, the total lack of any certification, in the first instance, remains a jurisdictional prerequisite. A contrary reading of § 605 would constitute a repeal by implication of the certification requirement of the CDA. Because the doctrine of repeals of implication is not favored, *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), the court finds that the certification requirement of § 605(c)(1) remains intact, as does prior case law holding that a lack of certification is a jurisdictional bar to the filing of a complaint in this court. *See Schlosser,* 705 F.2d at 1338–39; *Paragon Energy v. U.S.,* 645 F.2d 966, 227 Ct.Cl. at 184. To find otherwise thwarts the purpose behind certification. Allowing a contractor, any time prior to judgment, to provide certification in the first instance, would permit a contractor to file and maintain suit against the United States Government without the potential risk of liability for fraud; in essence, a contractor could test the waters before deciding to dive in or not. If Congress intended such an outcome, then it would either have removed the certification requirement in § 605(c)(1), or specifically allowed a contractor to cure a lack of certification.

*Hamza,* 31 Fed.Cl. at 324. The court, in closing, would also point out that the CDA requires the contractor to submit the certification to the contracting officer.[12] Scan-Tech furnished its certification to the court, not to the contracting officer, and even if it had submitted it to the contracting officer, such an act would have been futile, as the case was already in litigation and the contracting officer therefore was without authority at that point. *See Case, Inc. v. United States,* 88 F.3d 1004, 1009 (Fed.Cir.1996); *Hamilton Sec. Advisory Servs.,* 43 Fed.Cl. at 574; *see also* 28 U.S.C. § 516 (1993) (reserving authority to the Department of Justice for conducting litigation involving the United States as a party).

The court is mindful that Congress intended the 1992 amendment to eschew "wasteful and esoteric litigation" that the CDA's former certification provision had engendered. H.R. REP. No. 102–1006, at 28. With this in mind, the court has attempted to avoid an arcane and unnecessarily rigid application of the CDA to Scan–Tech's contract-based causes of action. However, this court has a duty to safeguard the proper application of its jurisdiction and to do so it must enforce the minimum requirements of the CDA that afford this court its jurisdiction over contract disputes. One of the CDA's basic minimum requirements is the submission of a defective, yet curable, certification. *Hamza,* 31 Fed.Cl. at 324. Where the plaintiff's submissions fail to meet that required minimum, as Scan–Tech's does here, this court has no choice but to dismiss the actions for a lack of jurisdiction. *See Wm. Schlosser,* 705 F.2d at 1338–39; *Hamilton Sec. Advisory Servs.,* 43 Fed.Cl. at 576, 581; *Pevar,* 32 Fed.Cl. at 825; *Hamza,* 31 Fed.Cl. at 324. Therefore, the court holds that Scan–Tech's complete failure to certify its claim prevents the court from asserting jurisdiction over counts I to IV in Scan–Tech's complaint.

## II. Motion to Dismiss for Failure to State a Claim—RCFC 12(b)(4)

Deciding a motion to dismiss for failure to state a claim upon which relief can be granted is different than deciding a motion to dismiss for lack of jurisdiction " '[f]or it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.' " *Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 639 (Fed.Cir. 1989) (quoting *Bell v. Hood,* 327 U.S. 678,

---

12. 41 U.S.C. § 605(c). The legislative history adds further support: "[c]ertification has always been tended [sic] to insure that complete, clear, and honest claims *are presented to Federal contracting officers,* and this requirement remains: Contracting officers are not required to address claims that do not comply with the provisions of 41 U.S.C. § 605." H.R. REP. No. 102–1006, at 28. (emphasis added).

682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). The important distinction between the two is that dismissing an action pursuant to RCFC 12(b)(4) carries res judicata effect, while a motion to dismiss for lack of jurisdiction does not. *Id.* at 640. Accordingly, the court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Because of the austerity inherent in a motion to dismiss under RCFC 12(b)(4),. the court broadly construes the allegations found in the complaint. *Ponder v. United States,* 117 F.3d 549, 552–53 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1040, 140 L.Ed.2d 106 (1998). The court must assume that plaintiff's well-pled factual allegations will be accepted as true. *Berkovitz v. United States,* 486 U.S. 531, 540, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Ponder,* 117 F.3d at 552–53. In addition, the court must draw all reasonable inferences from these allegations in favor of plaintiff. *Ponder,* 117 F.3d at 552; *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 215 (Fed.Cir.1993) (citing *Gould v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991), *cert. denied,* 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994)).

In count V of its Complaint, Scan–Tech asserts that the Government's retention of the prototype without payment represents a compensable taking. The Government contends that Scan–Tech's takings claim actually represents a breach of contract claim, and therefore, the court should dismiss Scan–Tech's takings claim because it fails to state a claim upon which relief can be granted. The theory upon which the Government's argument implicitly rests is that Scan–Tech's challenge of the Government's actions is based on the parties' contract and the rights it affords them, not the Fifth Amendment of the Constitution. In response, Scan–Tech asserts that, while limited, the Fifth Amend-

ment does apply in certain cases that also allege a breach of contract.[13] Thus, Scan–Tech argues that the court should permit it to develop its takings claim, and demonstrate that the facts of its case satisfy the limited circumstances.

Count V of Scan–Tech's complaint reads:

50. Plaintiff realleges paragraphs 1–49 as if set forth herein in their entirety.

51. The actions complained of herein committed by Defendants constitute the taking without just compensation the property of Plaintiff.

52. Such unlawful action by Defendants is in derogation of Scan–Tech's constitutional and legal rights.

Compl. ¶¶ 50–52. Scan–Tech's key allegation relating to its takings claim is that, at the Government's direction, it "arranged and paid for shipment of the [prototype] to the FAA–Tech Center in Atlantic City. Notwithstanding the FAA's promises, Scan–Tech has not been paid either for its overrun or shipping expenses." Compl. ¶ 32.

The Fifth Amendment provides in part: "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. To properly state a takings claim, plaintiff first must show some legally cognizable interest in the property at the time of the alleged taking. *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir.1993); *Illinois v. United States,* 15 Cl.Ct. 399, 404 (1988). Plaintiff next must demonstrate that the Government interfered with plaintiff's use of its property. *Buse Timber & Sales, Inc. v. United States,* 45 Fed.Cl. 258, 262 (1999). When the Government asserts its interest in property obtained pursuant to a valid contract, no taking occurs and no obligation arises under the Fifth Amendment to compensate the contracting party. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 75 F.3d 648, 657 (Fed.Cir.1996); *J.J. Henry Co. v. United States,* 188 Ct.Cl. 39, 411 F.2d

---

**13.** Although Scan–Tech did not expressly state its takings claim in the alternative, it would appear that Scan–Tech intended it to be pleaded as such, because its taking claim and breach of contract claim, to the extent that they both allege that the Government retained the prototype without pay-

ing for it, are mutually exclusive, meaning Scan–Tech would be entitled to a single recovery for the Government's failure to pay for the prototype. *See* RCFC 8(a) (permitting plaintiff to request relief in the alternative).

1246, 1250 (1969); *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed.Cl. 30, 34 (1998). Thus, the issue is whether the express writings in the contract or any of its modifications specify the parties' rights to possession of the prototype. If the express writings of the parties encompass the parties' right to possession, then Scan–Tech's takings claim should be dismissed, for the Government in negotiating with Scan–Tech, acted in a proprietary capacity, not its sovereign capacity. *See Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978); *Transpace Carriers, Inc. v. United States*, 27 Fed.Cl. 269, 274 (1992). Accordingly, the contract, not the Fifth Amendment, would offer Scan–Tech its redress for any Governmental interference with Scan–Tech's property rights in the prototype. *See Sun Oil*, 572 F.2d at 818; *Medina Constr.*, 43 Fed.Cl. at 546; *Sunrise Village Mobile Home Park, L.C. v. United States*, 42 Fed.Cl. 392, 404 (1998); *see also Janicki Logging Co. v. United States*, 36 Fed.Cl. 338, 346 (1996) (dismissing purported takings claim because it represented "nothing more than a garden variety contract dispute"), *aff'd*, 124 F.3d 226, 1997 WL 468285 (Fed.Cir.1997) (Table). Conversely, if the parties' express writings fail to evince an intent to address their rights in the prototype, then Scan–Tech should be permitted to advance its takings claim. *See Integrated Logistics Support Sys. Int'l*, 42 Fed.Cl. at 34.

Clearly, the contract is paramount to the court deciding whether to dismiss Scan–Tech's takings claim, yet significantly, neither party has furnished Contract No. DTFA03–89–C–00044 or any relevant portion of it to the court. It is therefore futile for the court to attempt to ascertain whether the parties' writings encompassed their rights in the prototype. Accordingly, as the Government has the burden to demonstrate beyond a doubt that Scan–Tech can prove no set of facts in support of its takings claim which would entitle it to relief, *see Conley*, 355 U.S. at 45–46, 78 S.Ct. 99, the Government's motion to dismiss Scan–Tech's takings claim, count V, is denied. Adding to the court's unwillingness to dismiss Scan–Tech's takings claim at this preliminary stage of the litigation is the fact that the contract is of a cost-reimbursement nature, meaning that, depending on the extent of Scan–Tech's reimbursement, Scan–Tech may have funded, in whole or in part, the production of a product which the Government now retains.

In so concluding, the court nevertheless must stay Scan–Tech's takings claim pending the resolution of Scan–Tech's contract claims, assuming Scan–Tech elects to file a properly certified claim consistent with the CDA. The central reason for the stay is the fact that Scan–Tech's takings claim is asserted in the alternative, relates to the contract, and ultimately depends on some form of contract interpretation. To allow the takings claim to proceed would require the court to decide matters of contract interpretation that could be determinative to Scan–Tech's contract claims. This would be putting the cart before the horse, because it is clear from Scan–Tech's complaint that the contract claims, rather than the takings claim, represent the brunt of Scan–Tech's claims. Therefore, staying Scan–Tech's takings claim allows the parties first to develop and clarify the issues surrounding Scan–Tech's contract claims that may affect the resolution or make moot the necessity of deciding the constitutional claim raised by Scan–Tech. The stay also prevents the parties from incurring discovery or litigation costs associated with the prosecution of the takings claim that may later be determined to be unnecessary.

## CONCLUSION

It is **ORDERED** that:

(1) The Government's motion to dismiss counts I to IV of Scan–Tech's complaint is **GRANTED** based on this court's lack of jurisdiction to entertain those claims. Should, following a valid final decision or deemed denial, the plaintiff decide to refile counts I to IV as a separate lawsuit in this court, the clerk shall assign that case to this judge.

(2) The Government's motion to dismiss count V of Scan–Tech's complaint is **DENIED**. Scan–Tech's takings claim is stayed pending the resolution of Scan–Tech's contract claims.

(3) The parties shall file a Joint Status Report with the court no later than 120 days from the date of this Order.

(4) Both parties shall bear their own costs.